**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>UPHEALTH HOLDINGS, INC., *et al.,*<br><br>Debtors.[1] | ) | Chapter 11<br><br>Case No. 23-11476 (LSS)<br><br>(Jointly Administered) |
| GLOCAL HEALTHCARE SYSTEMS PRIVATE LIMITED, DR. SYED SABAHAT AZIM, MS. RICHA SANA AZIM, MR. GAUTAM CHOWDHURY, AND KIMBERLITE SOCIAL INFRA PRIVATE LIMITED,<br><br>Plaintiffs,<br><br>vs.<br><br>UPHEALTH HOLDINGS, INC., UPHEALTH, INC., MOSHE BAR-SIMAN-TOV, RAMESH BALAKRISHNAN, MARTIN BECK, RALUCA DINU, GIL FROSTIG, AVI KATZ, CHIRINJEEV KATHURIA, NATHAN LOCKE, JOHN MIKULSKY, NEIL MIOTTO, MARIYA PYLYPIV, AGNES REY-GIRAUD, JEROME RINGO, AND BRAD WEIGHTMAN,<br><br>Defendants. | ) | Adversary Proceeding No. 24-50092 (LSS) |

**FIRST AMENDED COMPLAINT**

Glocal Healthcare Systems Private Limited ("**Glocal**"), Dr. Syed Sabahat Azim, Ms. Richa Sana Azim, Mr. Gautam Chowdhury, and Kimberlite Social Infra Private Limited ("**Kimberlite**")

[1] The debtors ("**Debtors**") in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: UpHealth Holdings, Inc. (6328); Thrasys, Inc. (7413); Comprehensive Care Alliance LLC (6965); Behavioral Health Services LLC (8110); BHS Pharmacy LLC (2475); Psych Care Consultants LLC (8822); and Reimbursement Solutions LLC (6388). Debtors' headquarters and the mailing address is 14000 S. Military Trail, Suite 202, Delray Beach, Florida 33484.

(collectively, "**Plaintiffs**"), file this Complaint against UpHealth Holdings, Inc. ("**UpHealth**" or "**UHH**"), UpHealth, Inc. f/k/a GigCapital2, Inc. ("**UHI**"), and against Moshe Bar-Siman-Tov ("**Bar-Siman-Tov**"), Ramesh Balakrishnan ("**Balakrishnan**"), Martin Beck ("**Beck**"), Raluca Dinu ("**Dinu**"), Gil Frostig ("**Frostig**"), Avi Katz ("**Katz**"), Chirinjeev Kathuria ("**Kathuria**"), Nathan Locke ("**Locke**"), John Mikulsky ("**Mikulsky**"), Neil Miotto ("**Miotto**"), Mariya Pylypiv ("**Pylypiv**"), Agnes Rey-Giraud ("**Rey-Giraud**"), Jerome Ringo ("**Ringo**"), and Brad Weightman ("**Weightman**") (collectively, the "**UpHealth Directors**")[2] (UHH, UHI, and the UpHealth Directors are collectively, "**Defendants**" or the "**UpHealth Parties**") and, in support thereof, allege the matters set forth below.[3]

## PRELIMINARY STATEMENT

1. There can be no mistake: Plaintiffs are the victims of Defendants' unlawful scheme to pillage Glocal for Defendants' own improper gain. Indeed, Defendants' self-serving and misguided attempt to portray Plaintiffs as bad actors is belied by the reality of Defendants' gross misconduct.

2. This case arises from Defendants' wrongful, negligent, deceptive, and fraudulent conduct in luring Plaintiffs into transactions whereby Defendants attempted to swindle Plaintiffs out of their thriving company, Glocal, and caused at least $200 million in damages to Plaintiffs. Defendants' improper and negligent conduct spans pre-contract negotiations, the terms of the contracts themselves, and post-contract malfeasance.

---

[2] Dinu, Frostig, Katz, Mikulsky, Miotto, and Weightman were members of the board of directors of GigCapital2 who authorized entry into the **BCA** (defined below). Bar-Siman-Tov, Balakrishnan, Beck, Dinu, Rey-Giraud, Kathuria, Katz, Locke, Miotto, Pylypiv, and Ringo were members of the board of directors of UpHealth, Inc., which was the entity that was created by the BCA.

[3] The bar date for each of the Plaintiffs was extended through and including July 31, 2024, for all purposes. *See* Order Approving Stipulation by and Between the Debtors and Certain Glocal Parties Concerning the Automatic Stay and the Bar Date, *In re UpHealth Holdings, Inc.,* No. 23-11476 (LSS), Docket No. 788 (Bankr. D. Del. July 3, 2024).

3. Glocal was founded in 2010 by Dr. Azim as an Indian healthcare company that earned international recognition for bringing affordable and innovative healthcare to underserved parts of India. When approached by Defendants in 2019, Glocal was on an upward trajectory and had already expanded into international markets and started seeking access to the American market.

4. In 2019 and 2020, the UpHealth Parties approached Plaintiffs with an offer to provide Glocal with access to capital and business synergies through a multi-stage business combination.[4] At the time, Glocal was in need of capital for the purpose of scaling up its proven business model. The UpHealth Parties portrayed UpHealth as an American financial powerhouse that could launch Glocal's business model into the stratosphere. The UpHealth Parties repeatedly assured Glocal that UpHealth was not interested in taking control of Glocal's business. Rather, the UpHealth Parties insisted that Glocal would maintain its autonomy and play a key role within UpHealth's portfolio of synergistic healthcare services companies. Plaintiffs reasonably relied on these assurances, among others, and eventually agreed to do business with UpHealth in October 2020. At the time of their agreement, neither UpHealth (a portfolio company) nor UpHealth's eventual parent, GigCapital2, Inc. (a "blank check company"), had done any substantial business. This was in stark contrast with Glocal's proven record of business success.

5. At great cost to Glocal, it was later revealed that the UpHealth Parties approached this transaction in bad faith and, in several cases, with negligent and reckless disregard for the truth. The UpHealth Parties not only made reckless and false misrepresentations about UpHealth's financial condition, such as their ability to honor financial commitments to Glocal and the other Plaintiffs, but also aimed to take control of Glocal by improperly inducing Plaintiffs to enter into a series of unnecessary and damaging transactions.

---

[4] UHI and UHH communicated primarily through their executives Balakrishnan and Beck.

6. In late 2020, the UpHealth Parties induced Glocal and certain of its shareholders to enter a Share Purchase Agreement (the "**SPA**"), the multi-stage structure of which was designed to conceal the UpHealth Parties' inability to perform their financial obligations under a transaction of this magnitude. To be sure, the UpHealth Parties recognized from the beginning that they did not have the capital necessary to honor their side of the bargain. This became increasingly clear at each stage of the incremental acquisition. Indeed, at nearly every contractual deadline for UpHealth to honor its financial commitments, the UpHealth Parties peppered Plaintiffs with misrepresentations that led Plaintiffs to believe that the overall business combination would fail unless they submitted to the UpHealth Parties' every request to delay or avoid performance of their contractual obligations.

7. For example, when the UpHealth Parties could not timely fund UpHealth's commitment to purchase a large tranche of Glocal's shares, the UpHealth Parties sidestepped their payment obligations by wrongfully inducing Plaintiffs into signing an amendment to the SPA that prematurely granted UpHealth 90% ownership of Glocal for nominal consideration. The UpHealth Parties accomplished this bait-and-switch by feeding Plaintiffs a series of reckless, or intentionally false, misrepresentations. Namely, that Plaintiffs would eventually receive all of the consideration they were owed under the SPA through option agreements but that, due to a technical regulatory requirement, the overall business combination would fail unless UpHealth possessed at least 90% of Glocal before Plaintiffs were paid their agreed compensation and expenses under the terms of the SPA. This was a complete fabrication. In the end, the UpHealth Parties failed to fully compensate Plaintiffs, and no such regulatory requirement existed.

8. In a further act of avoidance, the UpHealth Parties skirted their obligation under the SPA to issue Plaintiffs "freely tradeable" shares of UHI at a value "not less than $110 million." Rather than fulfill this contractual obligation, the UpHealth Parties chose to wrongfully induce

Dr. Azim[5] into signing a lock-up agreement[6] by misrepresenting the lock-up agreement as a "non-negotiable" component of the overall business combination when, in fact, it was not. As a result of that agreement, neither Dr. Azim, Ms. Azim, nor Kimberlite could sell their shares in UHI until the UpHealth Parties had driven the value of those very same shares into the ground. Other Plaintiffs and Glocal employees were discouraged or restricted from freely selling their shares.

9. Separately, the UpHealth Parties repeatedly promised Plaintiffs that UpHealth had the intent and financial strength to provide Glocal with necessary growth and working capital, including assuring in writing that UpHealth had access to "$100 million of cash in trust." Even so, consistent with the UpHealth Parties' pattern of dishonesty, UpHealth repeatedly failed to source or provide Glocal with the capital it was promised, significantly impeding Glocal's ability to grow as planned.

10. Among others, each of these acts of dishonesty—torts on their own—constitute breaches of the fiduciary duties that the UpHealth Directors owed to Plaintiffs by virtue of the UpHealth Parties' relationship as the ostensible owners of Glocal and majority shareholders (and the parties in effective control) of UHH and UHI. To make matters worse, the UpHealth Parties also failed to fulfill various contractual requirements under the SPA, such as providing the agreed cash investment and appointing Dr. Azim to key roles in UpHealth.

11. Initially, Glocal attempted to live with the relationship and provide essential healthcare in its operations despite UpHealth's attempts to disrupt Glocal at every turn.[7] But, upon

[5] The terms of the Lock-Up Agreement (defined below) impacted shares "beneficially owned" by Dr. Azim, which therefore impacted shares of UHI held by Dr. Azim, Ms. Azim, Kimberlite, and Eligere Limited Liability Company.

[6] The parties entered into this Lock-Up Agreement through their respective Identified Holders in the United States. The Identified Holders, as defined in Schedule A of the Lock-Up Agreement are: Chirinjeev Kathuria, Mariya Pylypiv, Alfonso W. Gatmaitan, Rewi Enterprises, LLC, Ramesh Balakrishnan, Dr. Azim, Jeffrey R. Bray, AM Physicians, LLC, Sequoia Capital India Investment Holdings III, Elevar Equity Mauritius, Ranjani Ramakrishna, TTC Healthcare Partners, LLC, Jacque Butler, Alexandra Bray, Samantha Josephine Bray (Jeffrey R. Bray Custodian Under the Utah Gifts to Minors Act); Anais Alexandra Bray (Jeffrey R. Bray Custodian Under the Utah Gifts to Minors Act).

[7] Defendants' efforts to control Glocal extended to other aspects of their relationship with Plaintiffs, including requiring that Glocal migrate its emails to UpHealth's servers. The email server of "glocal.healthcare" was taken over

learning the full scope of UpHealth's wrongdoing—and before Glocal was completely driven out of business—Plaintiffs took decisive action to protect their interests. In September of 2022, Plaintiffs started taking steps to mitigate their damages and eventually sever ties with UpHealth. Despite Plaintiffs' efforts to mitigate their damages,[8] the UpHealth Parties had already caused, without limitation, substantial and lasting damage to Glocal's business growth and its existing and prospective business opportunities and contracts. To date, the UpHealth Parties have either fraudulently or negligently pilfered or destroyed over $200 million of value in Glocal.

12. As a direct consequence of this wrongful conduct, the UpHealth Parties have been unjustly enriched in a number of ways. ***First***, the UpHealth Parties purport to be the rightful owners of Glocal and its digital clinics, medical facilities, technology, and business model. ***Second***, the UpHealth Parties retained the ability to appoint directors and managers. ***Third***, the UpHealth Parties retained capital that Glocal was otherwise entitled to receive, including agreed investments and reimbursements. ***Fourth***, the UpHealth Parties received outsized salaries and fees as insiders. ***Fifth***, the UpHealth Directors received shares at a steep discount and took UHH public to cash in on their interests, only to leave Plaintiffs holding the proverbial bag when those shares eventually plummeted. ***Sixth***, the UpHealth Parties unjustly benefited by completing a de-SPAC transaction at the expense of Plaintiffs, save for which, GigCapital2 would have been dissolved, triggering a

---

improperly by UHI. While access was given for email migration to UpHealth's domain, UpHealth started improperly copying data from the drive of Glocal's CEO to Balakrishnan's ID. When Glocal blocked this, UpHealth removed Glocal's administrative rights over its servers. Once Glocal filed a complaint in India, UHI stopped Glocal's access to the "uphealth inc" email id, thereby hindering Glocal's ability to access post 2021 documents and emails.

[8] Since September 2022, Plaintiffs have been forced to take various measures with respect to an arbitration and to defend against legal proceedings in India in order to enforce the terms of the SPA, the ancillary agreements, and their rights therein. Plaintiffs also refused to participate in arbitration proceedings which UpHealth initiated (ICC Case No. 27329/PDP) because, *inter alia*, the arbitral tribunal lacked jurisdiction. For further discussion on the Indian legal proceedings, *see* Respondents' (A) Objection to Debtors' Motion to (I) Enforce the Automatic Stay, (II) Award Damages for Willful Violations of the Automatic Stay, and (III) Permit the Debtors to Modify the Automatic Stay in Their Sole Discretion to Proceed With Litigation, and (B) Cross Motion for Relief From Stay, *In re UpHealth Holdings, Inc.*, No. 23-11476 (LSS), Docket No. 592 (Bankr. D. Del. May 14, 2024).

redemption. ***Finally***, UHH and UHI sought to recklessly and negligently usurp shares of Glocal, while disregarding obligations under the SPA.

13. Given these circumstances, Plaintiffs have no choice but to seek redress in this Court and discover the full extent of the UpHealth Parties' damaging actions.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157(b), 1334(a), and 1367. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and an adversary proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**").

15. The Court has personal jurisdiction over Defendants under Rule 7004 of the Bankruptcy Rules. Further, the Court has personal jurisdiction over the UpHealth Directors because they are current or former members of the UpHealth Board of Directors. *See* 10 DEL. CODE § 3114. Under Rule 7008 of the Bankruptcy Rules, Plaintiffs hereby consent to the entry of final orders or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

16. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## PARTIES

17. Plaintiff Glocal is a for-profit healthcare company organized under the laws of India and headquartered in Kolkata that operates tech-focused hospitals and clinics and a telehealth platform.

18. Plaintiff Dr. Syed Sabahat Azim ("**Dr. Azim**") is the founder and Non-Executive Chairman of Glocal and has a permanent residence located at 98, Ideal Villas, Mouza Koch Pukur, New Town Action Area 1A, Rajarhat, Kolkata - 700156, West Bengal, India.

19. Plaintiff Ms. Richa Sana Azim ("**Ms. Azim**") is a director, shareholder, and founder of Glocal and has a permanent residence located at 98, Ideal Villas, Mouza Koch Pukur, New Town Action Area 1A, Rajarhat, Kolkata - 700156, West Bengal, India.

20. Plaintiff Mr. Gautam Chowdhury ("**Mr. Chowdhury**") is a director and shareholder of Glocal and is located at 31/N. Block B, New Alipore, Kolkata - 700053, West Bengal, India.

21. Plaintiff Kimberlite is a private limited company incorporated in India, a shareholder of Glocal, and has its registered address at 7A, Bentinck Street, Old Wing, Kolkata - 700001, West Bengal, India.

22. Defendant UHH is the subsidiary of a SPAC (UHI, a behavioral healthcare services company), incorporated on October 26, 2020, organized under the laws of Delaware, and has its registered office for service of process at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

23. Defendant UHI is a behavioral healthcare services company incorporated under its former name, GigCapital2, Inc. on March 6, 2019, organized under the laws of Delaware, and has its registered office for service of process at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.[9]

24. Defendant Bar-Siman-Tov is a former member of the Board of Directors of UpHealth, Inc. (the "**UHI Board**"). Bar-Siman-Tov was one of the original members of the UHI Board after the creation of UHI.

---

[9] Under Section 3114 of the Delaware Code, the UpHealth Directors are deemed to have consented to the appointment of UHH's and UHI's registered agent as the agent upon whom service of process may be made in all civil actions or proceedings brought in this State arising out of the UpHealth Directors' acts performed in their official capacities. *See LeCrenier v. Central Oil Asphalt Corp.*, 2010 WL 5449838, at *2-3 (Del. Ch. Dec. 22, 2010).

25. Defendant Dinu is a current member of the UHI Board. Dinu was one of the original members of the UHI Board after the creation of UHI. Dinu is also a member of the Board of Directors of UHH (the "**UHH Board**").

26. Defendant Balakrishnan is the former CEO and Chief Strategy officer of UHI.

27. Defendant Beck is the former CFO and current CEO of UHI. Beck is also a current member of the UHI Board.

28. Defendant Frostig was a member of the UHI Board.

29. Defendant Katz is a current member of the UHI Board. Katz was one of the original members of the UHI Board after the creation of UHI. Katz is also a member of the UHH Board.

30. Defendant Kathuria is a current member of the UHI Board. Kathuria was one of the original members of the UHI Board after the creation of UHI.

31. Defendant Locke is a former member of the UHI Board. Locke was one of the original members of the UHI Board after the creation of UHI.

32. Defendant Mikulsky was a member of the UHI Board.

33. Defendant Miotto is a former member of the UHI Board. Miotto was one of the original members of the UHI Board after the creation of UHI and served as the chair of that board's audit committee.

34. Defendant Pylypiv is a current member of the UHI Board. Pylypiv was one of the original members of the UHI Board after the creation of UHI. Pylypiv was also a member of the UHH Board.

35. Defendant Rey-Giraud is a current member of the UHI Board. Rey-Giraud was one of the original members of the UHI Board after the creation of UHI.

36. Defendant Ringo is a former member of the UHI Board. Ringo was one of the original members of the UHI Board after the creation of UHI.

37. Defendant Weightman was a member of the UHI Board.

## FACTUAL BACKGROUND

***Glocal is founded by Dr. Azim and experiences rapid growth and international recognition.***

38. Dr. Azim is a medical doctor, former Indian Administrative Service officer, and successful entrepreneur. In 2010, after a decade of working as a civil servant, tragedy struck when Dr. Azim lost his father during an unnecessary and overpriced medical procedure. Already deeply frustrated with the state of healthcare in India, Dr. Azim resigned from his post as a well-respected Indian Administrative Service officer to launch an affordable healthcare company: Glocal.

39. Dr. Azim's vision was to use Glocal as a vehicle to blend traditional, acute-care hospital facilities with new healthcare technologies to deliver accessible, affordable, and accountable medical care across India. To that end, Glocal focuses on underserved areas in India and other countries where both public and private healthcare providers have historically struggled to deliver the most basic services.

40. Glocal has eleven full-service, multi-specialty hospitals throughout India and over 500 digital clinics. Glocal is committed to innovation at the intersection of technology and healthcare, increasing access to quality medical care and reducing costs for patients.

41. Glocal's digital clinics are operated by nurses and support staff and can be installed virtually anywhere the internet is available. These digital clinics offer remote consultations and examinations with doctors and can automatically dispense medications. Glocal's innovations have increased access to healthcare, particularly in rural areas that may lack access to a doctor.

42. Through Glocal's platforms, primary care visits typically cost around $5.00, and Glocal's model is repeatable and scalable.

43. For these achievements and others, the Schwab Foundation of the World Economic Forum recognized Dr. Azim as Social Entrepreneur of the Year in 2020, and the United Nations,

Bloomberg, and Indian industry groups have favorably recognized Glocal and Dr. Azim's work. Some of these many awards include: the Frost & Sullivan 2020 Indian Telemedicine Customer Value Leadership Award; the UN Health Innovation Exchange Awards 2020 Public Appreciation Award; the CMA Management Excellent Awards 2018; the Express Public Healthcare Awards Most Effective Health Technology Systems by a State Government 2018; and the Healthcare Senate Awards for Excellence 2018.

***Glocal explores international expansion and negotiates with the UpHealth Parties.***

44. In 2019, Kathuria and Pylypiv approached Dr. Azim with a proposal to create a combined, global, and digital healthcare company. At that time, the UpHealth Parties had already convinced two other companies to do business with them: (1) Transformations Treatment Center Healthcare Inc., which was controlled by Beck (UHI's current CEO); and (2) Thrasys, Inc., which was led by Balakrishnan (UHI's former CEO). Later, Behavioral Health Services LLC became one of UpHealth's targets.

45. As part of the initial discussions, the UpHealth Parties represented that they had the capacity to invest approximately $20 million in Glocal.

46. Given Glocal's need for capital to scale its business model, Glocal was receptive to the proposal that Kathuria and Pylypiv presented. And it was no secret that Glocal wanted additional capital. For example, UpHealth affiliate Al Gatmaitan ("**Mr. Gatmaitan**") told Dr. Azim that he was "very aware" that new capital would help Glocal.

47. The UpHealth Parties' proposal eventually changed from investing in Glocal to forming a new entity and acquiring and holding Glocal and other target companies through a Special Purpose Acquisition Company ("**SPAC**") transaction. The UpHealth Parties repeatedly represented to Dr. Azim and others at Glocal that they had no interest in running Glocal because they had no background in healthcare and, thus, truly could not run Glocal. While a newly formed entity, UHH,

would be Glocal's corporate parent, the UpHealth Parties assured Plaintiffs that UHH would primarily be a holding company and that Glocal would maintain its autonomy.

48. Specifically, the UpHealth Parties promised that Glocal's then-existing management team would continue to: (i) manage and control Glocal; (ii) serve on and nominate members of UHH's Board; (iii) appoint UHH's managers; and (iv) hold a 10% share in UHH.

49. The UpHealth Parties also assured Dr. Azim that Glocal's corporate structure would not change unless Dr. Azim recommended a change. Plaintiffs reasonably relied on these representations in pursuing further negotiations with the UpHealth Parties.

50. The negotiations continued in various forms. A June 29, 2020, term sheet signed by Kathuria (on behalf of UHH) and Dr. Azim described general terms and conditions of UHH's proposed acquisition of Glocal. Specifically, the term sheet described the proposed acquisition as UpHealth purchasing "100% of [the] fully diluted capital stock of Glocal." In turn, Glocal, in material part, would receive: (1) $15 million in cash for existing shareholders; (2) $4 million for growth capital; (3) $7 million in cash, to be paid to existing shareholders at a later date; (4) $35 million in UpHealth common stock, to be split between Dr. Azim and Glocal's other owners; and (5) the appointment of Dr. Azim to the role of President of UpHealth.

51. Between June and September 2020, SPAC GigCapital2, Inc. ("**GigCapital**") became involved in UpHealth and Glocal's negotiations. GigCapital was trading on the New York Stock Exchange ("**NYSE**") and by September 2020 its listing was at risk of expiring. Before GigCapital's initial public offering, GigCapital's initial investors purchased 4,307,500 shares of GigCapital for $25,000, or $0.005803 per share (the "**Founders' Shares**"). Meanwhile, shares of GigCapital were listed on the NYSE at $10 per share. Under its bylaws and organizational documents, GigCapital was required to acquire another company before its listing expired. Therefore, GigCapital's existence would be terminated and funds returned to its shareholders if it did not transact

business with Glocal, thereby depriving GigCapital's initial investors of the very lucrative returns they stood to reap on the Founders' Shares. GigCapital, therefore, made promises to Glocal, recklessly and with utter disregard to its own means to fulfil such promises, to induce Glocal and to protect the GigCapital SPAC from expiring.

52. Given the risk of expiration, the discussions shifted to a proposed business combination involving UpHealth, Glocal, and GigCapital. As part of these discussions, GigCapital and the UpHealth Parties represented that GigCapital had over $174 million in available funds to acquire another company and was in the process of raising even more capital.

53. Similarly, in late August 2020, Kathuria represented to Dr. Azim via email that "the SPAC shareholders . . . have $100 million of cash in trust." Plaintiffs reasonably relied on these representations in pursuing further negotiations with the UpHealth Parties and GigCapital.

54. In the following months, negotiations picked up speed. Given GigCapital's SPAC status, UpHealth and GigCapital moved quickly to lock-up Glocal, working toward finalizing the merger agreement by late October 2020.

55. As the deadline approached, the exact structure of the transaction took shape: Glocal shareholders would receive shares of the parent company, UHH, and UHH would merge with GigCapital before emerging as a new entity bearing the "UpHealth" name.

56. An August 2020 UpHealth presentation listed Dr. Azim as "President, International" under the slide title "UpHealth's Founder's Council." That understanding continued through September 2020, with Dr. Azim described as having a "key managerial role" in UpHealth post-merger. Despite these representations, Dr. Azim never became UpHealth's President, International.

57. On September 23, 2020, and after sending an initial draft of a merger agreement, Mr. Gatmaitan wrote to Dr. Azim as follows: "Be assured, we recognize and value the central role

Glocal plays in the UpHealth story. . . . Armed with working capital provided by the SPAC, key investors[,] and the public markets[,] the true potential of Glocal will be realized. . . . I am certainly committed to creating conditions that will enable Glocal to thrive." Further, in an email dated September 30, 2020, Pylypiv presented Dr. Azim with "a term sheet for a pipe investment of $210M[,]" which misled Plaintiffs into thinking that UpHealth had more than enough immediately available cash on hand to effect a transaction with Glocal. Once again, Plaintiffs reasonably relied on these representations in pursuing further negotiations with the UpHealth Parties and GigCapital.

***UHH, Glocal, and certain Glocal shareholders enter into the Share Purchase Agreement.***

58. On October 30, 2020, UHH entered into the Original Share Purchase Agreement (the "**Original SPA**,"[10] and, as later amended, the "**Amended SPA**") with Glocal and certain of its shareholders, including Dr. Azim, Ms. Azim, Mr. Chowdhury, Mr. Meleveetil Damodaran ("**Mr. Damodaran**"), and Kimberlite.[11] Under the terms of the Original SPA, and subject to certain conditions and warranties, UHH would acquire up to 90% of Glocal's share capital[12] in exchange for: (1) $22 million of cash consideration;[13] (2) $110 million worth of shares of UHH or its successors;[14] (3) the repayment or refinancing of $35 million in debt then held by Glocal;[15] and (4) a $4 million capital investment in Glocal for working and growth capital.[16]

59. Reflecting the role of the Original SPA in the overall business combination described above, the Original SPA conditioned UHH's acquisition of Glocal upon the completion of a business

---

[10] A true and correct copy of the Original SPA is attached hereto as **Exhibit A** and fully incorporated herein.

[11] Original SPA at 1-2 (identifying contracting parties as shareholders listed in Schedule 1), 37–38 (Schedule 1).

[12] *Id.* at Clause 4.2.15.

[13] *Id.* at Clause 2.2.

[14] *Id.* at Clause 4.2.8.

[15] *Id.* at Clause 10.1.

[16] *Id.*

combination agreement between UHH and GigCapital or another SPAC,[17] as well as two employment incentives for the "Promoter" of the SPA, Dr. Azim.

***UHH entered into a business combination agreement with GigCapital.***

60. Prior to the execution of the Original SPA, UHH and GigCapital negotiated the terms of a business combination agreement, which specified the terms by which GigCapital would take UHH and its portfolio of healthcare services companies public through a de-SPAC transaction, whereby UHH would merge with GigCapital into a combined, publicly-held entity. UHH and GigCapital finalized the business combination agreement (the "**BCA**") on November 20, 2020. GigCapital, in turn, would then be renamed UpHealth, Inc. Under the BCA, closing would occur only after the SEC had approved GigCapital's public S-4 registration statement describing the transaction. Glocal was given very little opportunity to weigh in on the BCA before it was executed.

***The UpHealth Parties strong-arm Glocal into giving them more control by mischaracterizing the acceleration of the share transfer as a mere technicality.***

61. On November 20, 2020, concurrent with the execution of the BCA, UHH began to acquire shares of Glocal. The Original SPA had contemplated that UHH would acquire Glocal in three stages. ***First***, UHH would purchase shares of Glocal from shareholders Elevar Equity Mauritius ("**Elevar**") and Sequoia Capital India Investment Holdings III ("**Sequoia**") in exchange for (1) a combination of cash consideration and promissory notes, which would later be paid off in cash; and (2) shares of UHH, which would later be converted into shares of UHI at the closing of the BCA (the "**NR Closing**").[18] ***Second***, UHH would purchase shares from Dr. Azim, Ms. Azim, Mr. Chowdhury, Mr. Damodaran, and Kimberlite by paying those shareholders directly in cash

[17] *Id.* at Clause 4.2.6 (describing the contemplated business combination agreement), Clause 4.3.7 (requiring shares of the SPAC to be listed on the NYSE as a condition precedent to closing of the Original SPA).

[18] Original SPA at Clause 5.1 (describing exchange of shares and promissory notes), Clause 1.1.36 (defining "Merger" as the transaction by which stockholders of UHH would receive shares in the SPAC), Clause 4.3.7 (requiring consummation of Merger as precondition to closing).

(the "**IR Cash Closing**").[19] ***Third***, UHH would acquire additional shares from Dr. Azim, Ms. Azim, Mr. Chowdhury, Mr. Damodaran, and Kimberlite by exchanging shares of UHH, which would later be converted into shares of UHI.[20]

62. Also on November 20, 2020, Glocal and UHH entered into an amendment to the SPA (the "**First Amendment**").[21] The First Amendment accelerated the purchase of all of Sequoia's shares and some of Elevar's shares to the date of execution of the First Amendment.[22] Thus, November 20, 2020, became the new "NR Closing," as defined in the SPA, and UHH made the required purchases through a combination of promissory notes and shares in UHH, which would later be converted into shares of UHI. Payment for the remainder of Elevar's shares was pushed out until the spring of 2021, in a transaction defined in the First Amendment as the "NR Closing 2." The First Amendment also made the closing of the BCA a condition precedent to the IR Cash Closing.[23]

63. In the spring of 2021, as the IR Cash Closing deadline approached, the SEC had not yet finished its review of GigCapital's Form S-4. Because SEC approval of the Form S-4 was a condition precedent to the closing of the BCA, which was in turn a condition precedent to the IR Cash Closing, the parties again agreed to amend the SPA in a series of agreements dated March 4, 2021 (the "**Second Amendment**"),[24] and March 23, 2021 (the "**Letter Agreement**").

64. The Second Amendment extended the IR Cash Closing date to March 30, 2021.

65. The Letter Agreement further extended the IR Cash Closing date to June 30, 2021.

---

[19] *Id.* at Clause 5.2 (describing cash purchase of shares from Cash Sellers).

[20] *Id.* at Clause 6 (describing exchange of shares with Option Sellers).

[21] A true and correct copy of the First Amendment is attached hereto as **Exhibit B** and fully incorporated herein.

[22] First Amendment at Clauses 2.9 (pages 17-18) (amending Clause 5.1.2 of the Original SPA), 2.10 (Page 18) (adding new Clause 5.1.A).

[23] First Amendment at Clause 2.6 (page 15) (amending Clause 4.6.7 of the Original SPA).

[24] A true and correct copy of the Second Amendment is attached hereto as **Exhibit C** and fully incorporated herein.

66. Concurrent with the negotiation of the Letter Agreement, UHH expressed urgency—on multiple occasions—for the premature transfer of Glocal's shares in advance of Glocal's receipt of the correlating consideration to which it was entitled under the SPA. UHH asserted that without showing a 90% acquisition in Glocal, UHH may not be able to close the BCA with UHI and take Glocal and the other UHH portfolio of companies public on the NYSE.

67. Around this time, UHI and UHH also made public announcements and filings claiming to have successfully raised tens of millions of dollars, in addition to the earlier representations to Glocal, implying that altogether $667.5 million was available to meet the representations and warranties in the SPA. In other words, the UpHealth Parties told Glocal that the acceleration of the share transfer was a mere technicality and that Glocal would be fully compensated as promised after the closing of the BCA.

68. In reasonable reliance on the UpHealth Parties' representations that the share exchange was a technical necessity for regulatory compliance, Glocal also agreed in the Letter Agreement to the early exchange of 90% of its shares for $3 million of working and growth capital—all with the understanding that Glocal and the other Plaintiffs would be compensated for the full $171 million in total consideration that they were entitled to under the SPA for 90% of the shareholding transaction to be completed after the BCA closed.

69. Those representations were not true. It was later uncovered that UHH was in fact facing much deeper issues that cast doubt on its financial wherewithal to qualify for listing on the NYSE, let alone perform its obligations under the SPA. Rather than manage its significant exposure under the SPA—caused by its misrepresentations—UHH further damaged Glocal by recklessly and negligently accelerating the acquisition of Glocal's shares, knowing that it was unlikely to ever satisfy its obligations under the SPA.

70. Unlike the cashless mergers through which UHH effected its other acquisitions, acquiring Glocal required UHH to "put its money where its mouth is" and provide consideration in the form of cash.

71. It was later learned that UHH never had the cash available to acquire Glocal. UHH personally and recklessly knew this and structured the acquisition of Glocal as a series of transfers, with each transfer of shares of Glocal exchanged contemporaneously for incremental consideration. After all, UHH needed to find a way to lock in Glocal on the front end, well before UHH intended to unveil its uncertain financial circumstances. Eventually, that is exactly what was slowly unveiled at each approaching deadline. The "technical necessity" turned out to be a pretext intended to drag Glocal down a narrow path that ultimately left Glocal with no choice but to have to agree to the renegotiated terms forced upon it by UHH.

***The UpHealth Parties failed to perform their contractual obligations.***

**a. UHH tenders locked-up shares worth only $7.56 million and engages in disloyal transactions.**

72. Under Clause 4.4.23 of the Amended SPA, UHH was required to issue shares of UHI to the Glocal sellers[25] at a value of "no less than" $110 million.

73. On May 14, 2021, and under the SPA, UHH issued Glocal one million shares of UHH. On June 9, 2021, following the closing of the BCA, Glocal's one million shares of UHH were converted into 10,798,327 shares of UHI. On the conversion date, UHI's shares traded at market values between $9.38 and $10.50 per share. The opening price was $10.47 per share, and the closing price was $9.38 per share.

74. The UpHealth Parties then induced Dr. Azim into entering a lock-up agreement by representing that it was a "non-negotiable" component of the overall business combination, when,

[25] The Glocal sellers include Plaintiffs, Elevar, Sequoia, and Mr. Damodaran. *See* SPA at Schedule 1, Parts A–C.

in fact, it was not. As a result, concurrent with Glocal's receipt of 10,798,327 shares of UHI, Dr. Azim entered into the Registration Rights and Lock-Up Agreement dated June 9, 2021 ("**Lock-Up Agreement**"),[26] under which Dr. Azim, who received UHI shares in connection with the SPA, was required to agree not to sell shares of UHI for up to one year. The Lock-Up Agreement's restrictions also prohibited the sale of shares held by Ms. Azim and Kimberlite.[27] Other Plaintiffs and Glocal employees were discouraged or restricted from freely selling their shares.

75. Immediately following the June 9, 2021 issuance date, the share value of UHI's stock began to sharply decline, dropping to $6 per share within a month, and to less than $1 per share by April of 2022—all against an issue price of $10 per share. When the Lock-Up Agreement expired on June 9, 2022, the damage had already been done. UHI's shares were trading at $0.69 per share. The shares that Glocal was told were worth $110 million, just a year later, were worth only $7.56 million.[28]

76. The carnage did not end there. On December 9, 2022, UHI's stock was required to undergo a reverse 10-1 stock split to prevent delisting by the NYSE. Share prices continued falling. And on June 9, 2023—the second anniversary of public trading—the value of Glocal's shares were less than $2 million.

77. The UpHealth Parties' actions were designed to benefit themselves by diverting value for themselves. While the stock price precipitously declined, insiders and those not subject to the fraudulent lock-up or otherwise discouraged or restricted from selling their shares were able to sell their shares and make money. For example, Beck (Chief Executive Officer of UHI who was not locked up) transferred shares to other entities that he owned for a yet unknown purpose. Balakrishnan

---

[26] A true and correct copy of the Lock-Up Agreement is attached hereto as **Exhibit D** and fully incorporated herein.

[27] The terms of the Lock-Up Agreement impacted shares "beneficially owned" by Dr. Azim, which therefore impacted shares of UHI held by Dr. Azim, Ms. Azim, Kimberlite, and Eligere Limited Liability Company (which holds the shares of Dr. Azim and Ms. Azim). *See* Lock-Up Agreement at Clause 5.1.1.

[28] Accounting for a share price of $7 at market close and a reverse stock split, the market value was $7,558,828.90.

(President and Chief Strategy Officer of UHI) sold 44,795 shares ***while*** he was locked up. Even today, after the reverse stock split and in bankruptcy, UHI is trading above the *de minimis* issuance price for Founders' Shares, meaning while the Plaintiffs who were bound by the Lock-Up Agreement or otherwise discouraged or restricted from selling their shares lost everything when the stock price tanked, those that sold Founders' Shares profited and may still be holding potentially profitable shares. Upon information and belief, Defendants also obtained substantial unjustified benefits from their role as insiders in the form of outsized salaries and fees and thereby also shielded themselves from the stock price plummeting.

**b. UHH failed to tender the full amount of its required initial investment of growth and working capital in Glocal.**

78. Under Clause 10.1 of the Original SPA, UHH (as the "Acquirer") or UHI (as UHH's "Affiliate") was required to make an initial cash investment in Glocal within ninety (90) days from the "NR Closing Date":

> 10.1 Within 90 (ninety) days from the NR Closing Date, the Acquirer or its Affiliate shall invest a minimum amount of USD 4,000,000 (United States Dollars Four Million) (the "**Primary Investment Amount**") in the Target, which shall be utilized by the Target for general corporate purposes (including growth capital and working capital requirements of the Target).

Original SPA at Clause 10.1.

79. In the First Amendment, the parties amended the timing of payments for the Primary Investment Amount to reflect the separate closing dates of NR Closing and NR Closing 2, requiring payment of $1 million within 90 days of the NR Closing Date and payment of $3 million prior to the date of NR Closing 2:

> 10.1 . . . Within 90 (ninety) days from the NR Closing Date, the Acquirer or its Affiliate shall invest a minimum amount of USD 1,000,000 (United States Dollars One Million) (the "**Primary Investment Amount**") in the Target, which shall be utilized by the

> Target for general corporate purposes (including growth capital and working capital requirements of the Target).

First Amendment at Clause 2.25 (amending Clause 10.1 of the Original SPA).

> 4.4.20. The Acquirer or its Affiliate shall have invested a minimum amount of USD 3,000,000 (United States Dollars Three Million) in the Target.

*Id.* at Clause 2.6 (amending Clause 4 of the Original SPA to include Clause 4.4.20).

80. As discussed above, the NR Closing occurred on May 14, 2021. Under the terms of the SPA, UHH thus owed Glocal $1 million of the Primary Investment Amount by August 12, 2021.

81. On February 3, 2021, Dr. Azim wrote an email to the UpHealth Parties informing them of a total fund requirement of $21.85 million for growth capital as per the revenue and fund required projections for calendar year 2021.

82. On March 25, 2021, UHH tendered Glocal $3 million for working and growth capital.

83. On July 3, 2021, UHH's CEO e-mailed Dr. Azim and others at Glocal, that "[UpHealth] heard loud and clear the critical importance of capital infusion for your companies in 2021 and 2022," attaching a capital request form for use at an upcoming board meeting. Despite filling out the capital request form, UpHealth failed to tender the remaining $1 million by August 12, 2021, and that amount remains outstanding. Defendants were well-aware that Glocal required this capital to pay for its day-to-day operations and would experience severe operational challenges (which could lead to challenges meeting its revenue projections) without it. Dr. Azim and others at Glocal kept Defendants well-informed of Glocal's operational need for new capital.

84. As a result of UpHealth's failure to tender the full $4 million "Primary Investment Amount," Glocal experienced a shortfall in payment for day-to-day operations and major operational challenges. On August 5, 2021, realizing that UpHealth was going to fail to make the required capital contributions, Dr. Azim desperately appealed to Beck (then-CEO of UHH), explaining the severe

consequences of the lack of capital: revenue opportunities were slipping away and Glocal's partners from across multiple regions were asking Dr. Azim for clear answers that he was unable to give.

**c. The UpHealth Parties failed to fulfill their obligation to appoint Dr. Azim to the board of UHH or UHI.**

85. Under the terms of the Amended SPA, Dr. Azim was to receive two employment incentives. Specifically, Dr. Azim would be appointed to the Board of Directors of "the Acquirer," and given a separate employment role as the Acquirer's CEO, International. As reflected in the parties' course of dealings, UHI's SEC filings,[29] and the language of the Original SPA,[30] it was always understood that these roles would be in UHI following the business combination.

86. During the course of the business combination, the UpHealth Parties urged Dr. Azim to step down from the leadership of Glocal. Relying upon the SPA's employment incentive provisions, Dr. Azim complied with the UpHealth Parties' requests and stepped down from his executive position as CEO of Glocal.

87. UpHealth's obligations related to Dr. Azim's employment incentives are described in Sections 4.4.14 and 5.1.2.(d) of the Amended SPA:

> 4.4.14 Finalisation of the Employment Agreement. The terms of the Promoter's employment and the form of the employment agreement amongst him and the Acquirer, shall have been finalized and executed in a form acceptable to the Acquirer and the Promoter (the "**Employment Agreement**"). The Acquirer confirms that the terms of the Employment Agreement between the Promoter and the Acquirer, shall not be less favorable in comparison with other persons holding a similar designation as that of the Promoter.

First Amendment at Clause 2.6 (amending Clause 4 of the Original SPA to include Clause 4.4.14).

> 5.1.2.(d) The Acquirer shall have taken necessary actions, including passing corporate resolutions for appointment of the Promoter on

[29] GigCapital2's S-4, filed February 8, 2021 at 423 (naming Dr. Azim as "Chief Executive Officer, International" of "the post-combination company upon consummation of the Business Combinations").

[30] This is further evident from Clause 4.2.11 of the Original SPA, which clarifies that the "SPAC shall be deemed to be the 'Acquirer'" for the purposes of the employment incentives.

> the Board of the Acquirer, on terms acceptable to the Promoter and which are no less favorable in comparison with other Directors appointed on the Board of the Acquirer[.]

*Id.* at Clause 2.9 (amending Clause 5.1.2.(d) of the Original SPA).

88. Despite multiple requests from Dr. Azim, the UpHealth Parties did not fulfill their obligations under the SPA, failed to finalize the terms of an employment agreement for Dr. Azim's position as CEO, International, and failed to pass the requisite corporate resolutions to place Dr. Azim on the UHI Board of Directors. As a result, Dr. Azim never received his employment incentives from UpHealth.

**d. UHH breached its obligations to confirm the SPA transaction consideration was based on a total enterprise value of $1.1 billion.**

89. In the First Amendment, Plaintiffs received assurances from UHH that the stock which Plaintiffs were receiving would be worth no less than the UpHealth Parties had been representing. Specifically, the First Amendment provides that UHH "shall confirm in writing to the Sellers that the transaction consideration payable to the stockholders of the Acquirer by the SPAC pursuant to the Merger Agreement is based on the total enterprise value of the Acquirer together with CloudBreak Health, LLC ("**CloudBreak**") being USD 1,100 million"—*i.e.*, $1.1 billion. First Amendment at Clause 4.2.6.[31] [32]

---

[31] The provision reads, "The Acquirer shall confirm in writing to the Sellers that the transaction consideration payable to the stockholders of the Acquirer by the SPAC pursuant to the Merger Agreement is based on the total enterprise value of the Acquirer together with CloudBreak Health, LLC ("**CloudBreak**") being USD 1,100 million (United States Dollars One Thousand One Hundred Million), subject to a pro rata adjustment of the Acquirer's enterprise value in the event all the Proposed Subsidiary Acquisitions are not completed. It is hereby agreed between the Parties that, notwithstanding any such adjustments to the Acquirer's enterprise value, the value of the Acquirer's Shares receivable by the NR Sellers and the Option Sellers pursuant to this Agreement as used in the merger consideration calculation under the Merger Agreement, shall be no less than USD 110,000,000[.]"

[32] For clarity, because the overarching business combination envisions UHI's ownership of both UHH and CloudBreak, Plaintiffs refer to "the total enterprise value of the Acquirer together with CloudBreak Health, LLC" as the total enterprise value of UHI.

90. However, it was later uncovered that the "total enterprise value" of UHI was never $1.1 billion, as that unsupported number was inflated to induce Plaintiffs into thinking they were getting ownership in a robust entity worth more than it actually was. Indeed, the stock conveyed to Plaintiffs was never "based on a total enterprise value" of $1.1 billion. Even if UpHealth had provided Plaintiffs with adequate assurances that the total enterprise value of UHI was $1.1 billion (which UpHealth did not), such assurances would have been false. Thus, UpHealth breached Clause 4.2.6 of the Amended SPA.

91. Plaintiffs incurred damages as a result of UpHealth's failure to comply with these contractual requirements.[33] Specifically, Plaintiffs were deprived of assurances that the consideration they received was stock in an entity with a total enterprise value of $1.1 billion. Instead, they received stock in an entity worth significantly less. If Plaintiffs had received any reliable indication of the post-merger entity's true total enterprise value, Plaintiffs (realizing that the UpHealth Parties had misled them) could have acted to cancel the transaction and further mitigate their damages. Plaintiffs were deprived of their rights to do so by UpHealth's conduct.

**e. UHH failed to fulfill its obligation to cover transaction costs associated with consummation of the transaction.**

92. In the Second Amendment, the parties amended Clause 19 to state that:

> All costs and expenses incurred by or on behalf of any Party to this Agreement in relation to the transactions contemplated in this Agreement (including expenses relating to fees of counsel, auditors and other advisors) ***shall be borne solely by the Acquirer***, and the other Parties shall have no liability in respect of such costs and expenses, unless otherwise provided under this Agreement.

Second Amendment at Clause 6 (amending Clause 19 of the Original SPA) (emphasis added).

[33] Under Clause 7.3 of the Amended SPA, UHH certified that its warranties "shall remain true and correct [at each milestone] with the same effect as though made at that time."

93. This provision of the Second Amendment entitles Glocal to reimbursement of its costs and expenses incurred in relation to the business combination. However, despite Glocal's several requests, UpHealth failed to reimburse Glocal for the entirety of its associated costs and expenses, leaving an outstanding balance of transaction costs of approximately $690,000.

**f. The UpHealth Parties induced Dr. and Ms. Azim to move to Dubai on the pretext of creating an international subsidiary of UpHealth, in order to exert improper control over Glocal in their absence.**

94. In early to mid-2021, the UpHealth Parties chose Dubai as the base from which UHI, in part through Glocal, would build out its international operations. The UpHealth Parties thereafter began to pressure Dr. Azim to relocate to Dubai from India under the false assurance that he would soon be named as UHI's CEO, International, and that the majority of his allegedly imminent professional responsibilities would therefore require his presence in Dubai.[34]

95. Relying upon these misrepresentations, the Azims reluctantly moved to Dubai in December 2021. Indeed, the move from India to Dubai came at great personal, professional, and pecuniary cost to the Azims. The move required the Azims to uproot their family, disrupt long-standing professional and personal ties, and incur substantial relocation and increased cost of living expenses.

96. However, even after incurring these considerable costs, the Azims were met with more broken promises. UHI did not build out its international operations, and Dr. Azim was neither appointed as UHI's CEO, International nor appointed a member of UHI's Board.

97. Ostensibly as a stop-gap measure (and in clear recognition of its failure to appoint Dr. Azim as CEO, International), UHI then hired Dr. and Ms. Azim as freely terminable contractors with significantly less favorable terms than those promised to Dr. Azim as the would-be CEO,

---

[34] The UpHealth Parties publicly repeated these false assurances in SEC filings, social media posts, and investor presentations.

International and a member of UHI's Board. UHI abruptly and unilaterally terminated Dr. and Ms. Azim's contracts on September 20, 2022, as retaliation for Glocal's initiating legal proceedings in India just six days earlier to address the improper copying of its email servers and records, which included the personal data of Glocal's employees and patients, and to protect Glocal from UHI's other wrongful conduct.[35]

## CLAIMS

### COUNT I:
### Breach of Fiduciary Duty under Delaware Law
### (Against the UpHealth Directors)

98. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

99. The UpHealth Directors owed Plaintiffs fiduciary duties arising from their control of entities in which Plaintiffs are minority shareholders: UHH and, later, UHI. The UpHealth Directors also owed Plaintiffs fiduciary duties by virtue of the relationship of trust that arose out of the SPA. The UpHealth Directors acted to exert control over Glocal. Accordingly, the UpHealth Directors acted as ostensible owners of Glocal, and majority shareholders of UHI, respectively, and therefore owed fiduciary duties to Glocal and to Plaintiffs.

100. In particular, the UpHealth Directors owed Plaintiffs the fiduciary duty of loyalty—*i.e.*, a duty to put the best interest of the corporation and its shareholders over personal interest. Further, the UpHealth Directors owed Plaintiffs a fiduciary duty of care—*i.e.*, to use the amount of care that a careful and prudent person would use in similar situations. This duty included the obligation to preserve the assets of Glocal, provide working capital sufficient to meet Glocal's requirements, and not bring about considerable financial harm.

---

[35] Glocal had a fiduciary duty to protect its employees, patients, and other stakeholders and also had regulatory compliances to meet. Had it not filed these proceedings, Dr. Azim, Ms. Azim, Glocal itself, along with numerous others, would almost certainly be facing multiple lawsuits and regulatory proceedings stemming from UHI's wrongful conduct.

101. The UpHealth Directors engaged in numerous bad acts that violated these fiduciary duties and were grossly negligent at the expense of Plaintiffs, and for the personal benefit of the UpHealth Directors.

102. After receiving shares at a deeply discounted price, the UpHealth Directors put their own interests ahead of other shareholders by going public—at the expense of the other shareholders—to avoid losing their initial investment and with the intent of cashing in on their interests, leaving minority shareholders like Plaintiffs holding the bag as the stock plummeted. The UpHealth Directors installed themselves on UHI's Board, wrote its bylaws without sharing the drafts with Plaintiffs in order to remain in control, and used the money as they saw fit and to the detriment of Plaintiffs.

103. Additionally, the UpHealth Directors deceptively induced Dr. Azim into entering into the Lock-Up Agreement by falsely telling Dr. Azim that it was a "non-negotiable" component of the overall business combination. Other Plaintiffs and Glocal employees were discouraged or restricted from freely selling their shares.

104. The UpHealth Directors represented that the shares of UHI would be issued to Glocal's participating shareholders at a value, "notwithstanding any such adjustment to the Acquirer's enterprise value, the value of Acquirer's shares receivable," of "no less than" $110 million.[36] Contrary to this representation, the UpHealth Directors then facilitated the Lock-Up Agreement, only to have the shares fall to $7.56 million after the lock-up period expired—at the expense of Plaintiffs and for the benefit of the UpHealth Directors. While the stock price precipitously declined, insiders

[36] The provision reads, "The Acquirer shall confirm in writing to the Sellers that the transaction consideration payable to the stockholders of the Acquirer by the SPAC pursuant to the Merger Agreement is based on the total enterprise value of the Acquirer together with CloudBreak Health, LLC ("**CloudBreak**") being USD 1,100 million (United States Dollars One Thousand One Hundred Million), subject to a pro rata adjustment of the Acquirer's enterprise value in the event all the Proposed Subsidiary Acquisitions are not completed. It is hereby agreed between the Parties that, notwithstanding any such adjustments to the Acquirer's enterprise value, the value of the Acquirer's Shares receivable by the NR Sellers and the Option Sellers pursuant to this Agreement as used in the merger consideration calculation under the Merger Agreement, shall be no less than USD 110,000,000[.]" First Amendment at Clause 4.2.6; *see also* SPA at Clause 4.2.8.

and those not subject to the fraudulent Lock-Up Agreement were able to sell their shares and make money, while Plaintiffs could not. Upon information and belief, the UpHealth Directors also obtained substantial unjustified benefits from their role as insiders in the form of outsized salaries and fees and thereby also shielded themselves from the stock price plummeting.

105. Upon information and belief, at the direction of the UpHealth Directors, UpHealth paid its own debt owed to Kepos Alpha Master Fund LP, a Cayman Island limited partnership, as part of an undisclosed Forward Share Purchase Agreement, instead of honoring its obligations to Glocal and the other Plaintiffs under the SPA.

106. The UpHealth Directors promised to provide Glocal with sufficient working capital beyond the terms of the Amended SPA to facilitate Glocal's projected growth model, which, as finalized, required $21.85 million of working capital. However, after Glocal issued its shares to UHH and, later, UHI, as required under the SPA, the UpHealth Directors (and, by extension, the UpHealth Parties) failed to provide Glocal the necessary working capital as promised.

107. The UpHealth Directors promised to make an initial cash investment of $4 million but only provided $3 million—at the expense of Plaintiffs and for the benefit of the UpHealth Directors. UpHealth refused to pay this shortfall despite its recognition of "the critical importance of this capital infusion" to Glocal's business.

108. The UpHealth Directors promised to create synergy between Glocal and UpHealth for the benefit of Glocal, including by appointing Dr. Azim to key roles (*e.g.*, CEO, International, the board of directors) and including Glocal stakeholders in key decisions, but failed to deliver—at the expense of Plaintiffs and for the benefit of the UpHealth Directors.

109. The UpHealth Directors promised that UpHealth would cover Glocal's transactions costs, but UpHealth never did—at the expense of Plaintiffs and for the benefit of the UpHealth Directors.

110. The UpHealth Directors negligently failed to provide accurate information (as detailed herein) when negotiating the SPA and its subsequent amendments—at the expense of Plaintiffs and for the benefit of the UpHealth Directors.

111. The UpHealth Directors provided false information and false promises, such as that Glocal would maintain its autonomy within UpHealth and Glocal's management team would play key roles within UpHealth—at the expense of Plaintiffs and for the benefit of the UpHealth Directors.

112. The UpHealth Directors also improperly and incorrectly undervalued Glocal by around $10.4 million by valuing Glocal's developed land assets as raw land assets, wrongfully and negatively impacting Glocal's overall valuation.

113. The UpHealth Directors, in January of 2021, falsely represented that Plaintiffs must transfer 90% of their shares of Glocal to UpHealth to comply with NYSE requirements—at the expense of Plaintiffs and for the benefit of the UpHealth Directors.

114. The UpHealth Directors pressured the Azims to move to a new country, caused them a huge loss of money and, in their absence, tried to exert improper control over Glocal.

115. Upon information and belief, each of the foregoing actions were part of an unlawful scheme to take advantage of Plaintiffs for the benefit of the UpHealth Directors and to the detriment of Plaintiffs.

116. At each stage, Plaintiffs tried to work with the UpHealth Directors to address their fiduciary failures, but the UpHealth Directors refused. Instead, the UpHealth Directors acted in a grossly negligent manner.

117. For instance, the UpHealth Directors prioritized UHH's and UHI's growth and plan for their own gain, without regard to Glocal's solvency, value, or long-term wealth-creating capacity.

118. But for the UpHealth Directors' breaches of fiduciary duty, Glocal would not have lost at least $200 million of value.

119. Despite its duty to provide working capital contributions to ensure the financial health and stability of Glocal's business, the UpHealth Directors left Glocal grossly underfunded, which has caused lost opportunities and significant lost profits.

120. But for the UpHealth Directors' breaches of fiduciary duty, Plaintiffs would not have suffered personal and professional upheaval nor incurred substantial costs. Notably, Dr. and Ms. Azim were induced by the UpHealth Parties to make a costly relocation from India to Dubai—a move that involved uprooting their family, disrupting long-standing professional and personal ties, and incurring substantial expenses. Additionally, Plaintiffs incurred significant "ramp up" expenses in anticipation of the acquisition, including substantial professional fees and expenses, and were compelled to step down from key roles, thereby sacrificing established positions and prejudicing their future opportunities.

121. But for the UpHealth Directors' breach of fiduciary duty in inducing Dr. Azim to enter into the Lock-Up Agreement, Dr. Azim, Ms. Azim, and Kimberlite (along with others) could have sold their shares prior to the massive drop in stock price.

122. To remedy the breach of fiduciary duty, any personal benefit that the UpHealth Directors obtained from the breach is subject to disgorgement, along with other damages.

123. To remedy the breach of fiduciary duty, Plaintiffs are entitled to attorneys' fees under Delaware law.

## <u>COUNT II:</u><br>Breach of Contract Regarding UpHealth's Valuation<br>(Against UpHealth)

124. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

125. Under the express terms of Clause 4.4.23 of the Amended SPA, UHH and UHI were required to issue Glocal shares at a value "no less than" $110 million, and, under the Amended SPA, those shares were required to be, "when issued and delivered in accordance with the terms of the

[SPA], duly authorized, validly issued, ***freely tradeable***, fully paid and **free of Encumbrances**[.]" Amended SPA at Schedule 4, Part B, Clause 7 (emphasis added).

126. On May 14, 2021, and in connection with the SPA, UHH issued Glocal 1 million shares of UHH.

127. On June 9, 2021, Glocal's shareholder's 1 million shares of UHH were converted into 10,798,327 shares of UHI. On the conversion date, UHI's shares traded at market values between $9.38 and $10.50 per share. The opening price was $10.47 per share, and the closing price was $9.38 per share.

128. Also on June 9, 2021, Dr. Azim was wrongfully induced into entering the Lock-Up Agreement. Under this agreement, UHI shares "beneficially owned" by Dr. Azim (*i.e.*, the shares issued to Dr. Azim, Ms. Azim, and Kimberlite in connection with the SPA) could not be sold from June 9, 2021, through June 9, 2022. As such, the shares issued to Dr. Azim, Ms. Azim, and Kimberlite were not delivered "freely tradeable" or unencumbered. Other Plaintiffs and Glocal employees were discouraged or restricted from freely selling their shares.

129. Immediately after the issuance of the UHI shares on June 9, 2021, the share value of UHI's stock fell precipitously, reaching less than $6 per share within a month, and then to less than $1 per share—all against an issue price of $10 per share.

130. Because UHI's stock fell precipitously, UHI's stock was required to undergo a reverse 10-1 stock split to prevent delisting by the NYSE.

131. By the time the Lock-Up Agreement expired on June 9, 2022, Glocal's shares of UHI had precipitously declined to a total value of less than $7.56 million.

132. Therefore, as a direct result of UpHealth's conduct, UpHealth materially breached its contractual obligation to issue "freely tradeable" and unencumbered shares to Dr. Azim, Ms. Azim,

and Kimberlite at a value proportionate to the total $110 million share value required under the Amended SPA.

133. As a result of this material breach, Dr. Azim, Ms. Azim, and Kimberlite sustained damages of an amount equal to the difference between the promised value of their shares and the value of their shares following the expiration of the Lock-Up Agreement.

**COUNT III:**
**Breach of Contract Regarding UpHealth's Investment**
**(Against UHH and UHI)**

134. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

135. Under Clause 10.1 of the Original SPA, either "the Acquirer or its Affiliate" (*i.e.*, UHH or UHI) was required to make an initial cash investment of $4 million in Glocal within ninety days from the NR Closing date.

136. Under Clauses 2.25 and 2.6 of the First Amendment, the timing of the $4 million investment changed. Specifically, Glocal was to receive (1) $1 million within 90 days from the NR Closing date; and (2) $3 million before the NR Closing 2 date.

137. May 14, 2021 was the NR Closing date.

138. UHH and UHI, therefore, owed Glocal $1 million by August 12, 2021 (*i.e.*, within 90 days from the NR Closing date).

139. While Glocal received $3 million on March 25, 2021, it did not receive the remaining $1 million by August 12, 2021 as required under the First Amendment.

140. UHH's and UHI's failure to provide the remaining $1 million is a material breach of the First Amendment.

141. As a result of this material breach, Glocal sustained damages in the amount of $1 million.

142. Further, as a result of this material breach, Glocal sustained damages in the form of disruption to day-to-day operations, loss of potential revenue, and disruption of relationships with other contractual parties due to the capital shortfall.

**COUNT IV:**
**Breach of Contract Regarding Dr. Azim's CEO, International and UHI Board Appointments**
**(Against UHH and UHI)**

143. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

144. Under the terms of the Amended SPA, Dr. Azim—as the "Promoter"—was promised appointment to the UHI Board of the "Acquirer."

145. Specifically, the Amended SPA provides in relevant part: "The Acquirer shall have taken necessary actions, including passing corporate resolutions for appointment of the Promoter on the Board of the Acquirer, on terms acceptable to the Promoter and which are no less favorable in comparison with other Directors appointed on the Board of the Acquirer."[37]

146. Under the terms of the Amended SPA, Dr. Azim—as the "Promoter"—was promised a separate role as the CEO, International of the "Acquirer."

147. Specifically, the Amended SPA provides in relevant part: "The terms of the Promoter's employment and the form of the employment agreement amongst him and the Acquirer, shall have been finalized and executed in a form acceptable to the Acquirer and the Promoter (the 'Employment Agreement'). The Acquirer confirms that the terms of the Employment Agreement between the Promoter and the Acquirer, shall not be less favorable in comparison with other persons holding a similar designation as that of the Promoter."[38]

---

[37] Amended SPA at Clause 5.1.2.(d).

[38] *Id.* at Clause 4.4.14.

148. The "Acquirer" was UHH and, eventually, UHI, as evidenced by the negotiations, business combination, language of the Original SPA, and UHI's SEC filings.

149. Dr. Azim, who at the time of the Amended SPA was CEO of Glocal, was not appointed to UHI's Board nor was he appointed as UHI's CEO, International.

150. Indeed, Dr. Azim requested his required appointments on multiple occasions, but UHH and UHI failed to fulfill their contractual obligations to (1) appoint Dr. Azim as CEO, International; and (2) pass the requisite corporate resolutions to place Dr. Azim on either UHH's or UHI's Board.

151. As a result, UHH and UHI materially breached the express terms of the Amended SPA.

152. As a result of UpHealth's material breach, Dr. Azim sustained damages.

153. Specifically, in reliance on the Amended SPA and at the UpHealth Parties' urging, Dr. Azim stepped down from his Glocal CEO position.

154. After stepping down, Dr. Azim did not receive the financial and other employment benefits associated with appointment to UHI's CEO, International and to UHI's Board, or anything comparable.

155. In this way, Dr. Azim received "less favorable" terms of employment "in comparison with other persons holding a similar designation."

156. Dr. Azim is entitled to compensation for a CEO, International level employment of a billion dollar enterprise for a period of June 2021 to June 2024 (3 years), *i.e.*, a sum of approximately $1.5 million (at a salary of $500,000 per annum).

**<u>COUNT V:</u>**
**Breach of Contract (Enterprise Value) under Delaware Law**
**(Against UpHealth)**

157. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

158. Section 4.2.6 of the First Amendment required that UpHealth confirm in writing that the transaction consideration payable to the stockholders of UpHealth by the SPAC pursuant to the Merger Agreement was based on UHI having a total enterprise value of $1.1 billion.

159. Despite this contractual language, (1) the total enterprise value of UHI was never $1.1 billion, (2) the transaction consideration was based on a total enterprise value of UHI that was well-below $1.1 billion, and (3) UpHealth never provided empirical support for the total enterprise value of $1.1 billion. Therefore, UpHealth has materially breached several obligations under Section 4.2.6 of the Amended SPA.

160. As a result of UpHealth's breaches, Plaintiffs received consideration in an entity far below the value for which they had bargained and, having never received written assurance of the total enterprise value, were deprived of the opportunity to mitigate their damages by acting based on that written information.

**COUNT VI:**
**Breach of Contract Regarding Transaction Expenses**
**(Against UpHealth)**

161. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

162. Under Clause 6 of the Second Amendment, "the Acquirer" (UHI or UHH) must pay "all costs and expenses incurred by or on behalf of any Party to this Agreement in relation to transactions completed in this Agreement[,]" which include "expenses related to fees of counsel, auditors and other advisors."

163. After incurring costs and expenses in relation to transactions completed under the SPA, including lawyers and advisory fees, Glocal asked UpHealth to reimburse it for its costs and expenses.

164. UpHealth failed to reimburse Glocal for its associated costs and expenses in the amount of approximately $690,000.

165. UpHealth's failure to reimburse Glocal is a material breach of the Second Amendment.

166. As a result of UpHealth's material breach, Glocal sustained damages in the amount of approximately $690,000.

167. Due to the forced move to Dubai, the Azims incurred personal costs of more than $800,000 and resulting lost employment opportunities leading to further damages.

**COUNT VII:**
**Fraudulent Inducement and Negligent Misrepresentation (Lock-Up Agreement) under Delaware Law**
**(Against the UpHealth Parties)**

168. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

169. During the negotiation of the BCA, the UpHealth Parties represented to Dr. Azim that it was a contractual requirement for him to "lock-up" all shares "beneficially owned" by Dr. Azim for one year.

170. Despite their duty to provide accurate information, the UpHealth Parties supplied false information, either intentionally or negligently, through the failure to exercise reasonable care.

171. In the alternative, the UpHealth Parties were recklessly negligent and indifferent to the falsity of that alleged requirement or knew that the statement regarding the alleged requirement was false at the time it was made.

172. Purely in good faith and in justifiable reliance on the UpHealth Parties' representations, Dr. Azim, Ms. Azim, and Kimberlite held their shares, which were "beneficially owned" by Dr. Azim, for one year, all while UHI's stock precipitously fell and while other shareholders were able to trade their shares. Further, upon information and belief, the UpHealth Directors were able to sell their shares in UHI for a profit and for consideration well in excess of the value of those shares at the end of the one-year lock-up period.

173. Dr. Azim, Ms. Azim, and Kimberlite collectively suffered losses in excess of $58 million as a result of the UpHealth Parties' actions with respect to the Lock-Up Agreement.

174. To remedy Defendants' negligence, bad faith, and fraud, Plaintiffs are entitled to attorneys' fees under Delaware law.

**COUNT VIII:**
**Fraudulent Inducement and Negligent Misrepresentation (March 23, 2021 Letter Agreement) under Delaware Law (Against UpHealth)**

175. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

176. UpHealth represented to Plaintiffs that Plaintiffs needed to transfer 90% of their shares of Glocal to UpHealth to comply with NYSE requirements.

177. Despite its duty to provide accurate information, UpHealth supplied false information, either intentionally or through its failure to exercise reasonable care.

178. In the alternative, UpHealth was recklessly negligent and indifferent to the falsity of that alleged requirement and/or knew that alleged requirement was false at the time it was made.

179. The purpose of UpHealth's negligent misrepresentation was to induce Plaintiffs to transfer their shares early and without proper consideration.

180. Purely in good faith and in justifiable reliance on UpHealth's representations, Plaintiffs exchanged 90% of their shares for $3 million of working and growth capital—all with the understanding that Plaintiffs would be compensated for the full $171 million in total consideration that they were entitled to under the SPA after the BCA closed.

181. Plaintiffs suffered damages as a result of UpHealth's actions.

182. To remedy Defendants' negligence, bad faith, and fraud, Plaintiffs are entitled to attorneys' fees under Delaware law.

**COUNT IX:**
**Negligent Misrepresentation under Delaware Law**
**(Against UHH and UHI)**

183. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

184. UHH and its acquirer UHI each had a pecuniary duty to provide Plaintiffs with accurate information, particularly after the entities entered into the SPA with Plaintiffs, effectively engaging in a joint enterprise with Plaintiffs.

185. But instead, UHH and UHI provided false information or, in the alternative, were negligent and failed to exercise reasonable care in communicating the information, as evidenced by the nature and extent of the misrepresentations.

186. As alleged herein, this included, but is not limited to, statements that: (1) Glocal would maintain autonomy within UHI; (2) Glocal's management team would join the management of UHH and UHI; (3) Dr. Azim would be appointed CEO, International of UHH or UHI; (4) UHH would initially invest $4 million in Glocal; and (5) UHH would pay Plaintiffs' costs and expenses incurred in relation to the transaction. In addition, UHH and UHI falsely represented to Plaintiffs that (a) Plaintiffs needed to transfer 90% of their shares of Glocal to UHH in order to comply with NYSE requirements, and (b) it was a non-negotiable contractual requirement for Plaintiffs to "lock-up" all shares beneficially owned by Dr. Azim for one year.

187. Purely in good faith and in justifiable reliance on UpHealth's representations, Plaintiffs reasonably relied on UpHealth's misrepresentations, including by: (1) Glocal incurring "ramp up" expenses in anticipation of the acquisition; (2) Dr. and Ms. Azim moving from India to Dubai, UAE; (3) Dr. Azim stepping down from his role as CEO of Glocal as requested by Plaintiffs; and (4) Plaintiffs incurring professional fees and expenses. In addition, Plaintiffs reasonably relied on representation (a) above in entering into the March 23, 2021 Letter Agreement; and Dr. Azim reasonably relied on representation (b) above in entering into the Lock-Up Agreement.

188. Plaintiffs suffered damages as a result of the UpHealth Parties' misrepresentations in excess of $200 million.

**COUNT IX:**
**Unjust Enrichment (Regarding the Entire Transaction) under Delaware Law**
**(Against UHH and UHI)**

189. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

190. UHH and UHI were enriched by receiving a significant interest in Glocal and all corresponding benefits without adequate compensation.

191. Plaintiffs were damaged because Plaintiffs received shares in a doomed company (UHH and, later, UHI) in exchange for giving UHH and its parent UHI the benefit of a significant interest (and all corresponding benefits) in Glocal.

192. By receiving shares in a doomed company (UHH and, later, UHI) in exchange for giving away shares in a promising company (Glocal), Plaintiffs were hindered from continuing the ongoing success of Glocal and growing it to the level it would have been but for UpHealth's reckless and negligent conduct.

193. In providing UHH and UHI with a significant part of Plaintiffs' interest in Glocal, Plaintiffs acted for the benefit of UHH and UHI at Plaintiffs' expense.

194. There is a direct relationship between UHH's and UHI's unjust enrichment and Plaintiffs' impoverishment because Plaintiffs agreed to transfer a substantial proportion of their ownership interest (in the form of its shares)[39] in exchange for UHH shares (and, later, UHI shares) that UHH and UHI, upon information and belief, knew were shares in a doomed company. While the stock price of UHI precipitously declined, insiders and those not subject to the fraudulent Lock-Up Agreement or otherwise discouraged or restricted from selling their shares were able to sell their

[39] As discussed *supra* at ¶ 11, Plaintiffs acted to mitigate the damages caused by Defendants by cancelling all but 16.56% of UHH shareholdings in Glocal.

shares and make money, while Plaintiffs' shares lost value in their hands. Upon information and belief, Defendants obtained substantial unjustified benefits from their role as insiders in the form of outsized salaries and fees and thereby also shielded themselves from the stock price plummeting.[40]

195. There is no justification for UHH's and UHI's enrichment, as, upon information and belief, UHH and UHI each engaged in a reckless or deliberate scheme to seize control of Glocal while also knowing that the UHH (and, later, UHI) shares that Glocal received in return were doomed.

196. There is no other adequate remedy at law regarding UHH's and UHI's unjust conduct because the entire transaction between the UpHealth Parties and Glocal, as a whole, was tainted by conduct that is against fundamental principles of justice or equity and good conscience.

197. Indeed, the UpHealth Parties engaged in a series of bait-and-switch tactics in which they made assurances and promises—such as Plaintiffs' key roles in the merged company—that never came to fruition.

198. In other words, while Plaintiffs' other claims seek relief for specific contractual damages or damages associated with being induced into the transactions, no other claim or legal remedy reaches the full scope of the UpHealth Parties' inequitable conduct and the corresponding damage to Plaintiffs.

199. In this way, the contractual agreements between Plaintiffs and the UpHealth Parties do not govern the full scope of the parties' relationship.

[40] The Amended SPA defines "Acquirer Warranties" in Schedule 4, Part B, which states that the Glocal Shareholders were to receive the "common shares of the Acquirer free from any Encumbrance". Further in Clause 7.3 of the Amended SPA, it is specifically stated that the "Acquirer Warranties" were to remain "true and correct as of the Execution Date and shall remain true and correct as on each of the NR Closing Date, the IR Cash Closing Date and the OS Closing Date, with the same effect as though made at that time." Therefore, notwithstanding the Lock-Up Agreement, the shareholders of Glocal, under the Amended SPA, should have received the value of common stock of UHI for a value of not less than $110 million, which they did not.

200. As a direct result of the UpHealth Parties' conduct, Glocal lost its shares and the value associated with them, thereby financially harming Glocal and Glocal's ability to capitalize on its internationally recognized and promising business model.

201. Specifically, as a direct result of the UpHealth Parties' conduct, Plaintiffs lost at least $200 million of value.

202. To remedy the unjust enrichment, Plaintiffs are also entitled to disgorgement of any benefit that UHH or UHI received.

**COUNT X:**
**Unjust Enrichment (Regarding Dr. Azim's Appointments) under Delaware Law**
**(Against UpHealth and the UpHealth Directors)**

203. Plaintiffs incorporate by reference and re-allege all the preceding paragraphs herein.

204. If the Court determines Clause 4.4.14 of the Amended SPA is an insufficient basis for breach of contract, Plaintiffs plead, in the alternative, a claim for unjust enrichment related to the benefits gained by UHH, UHI, and the UpHealth Directors from not appointing Dr. Azim as CEO, International or to the UHI Board of the "Acquirer" (*i.e.*, UHH or UHI).

205. Specifically, the UpHealth Parties were enriched by retaining the compensation that would have otherwise gone to Dr. Azim if he were appointed as CEO, International and to the Acquirer's Board.

206. Dr. Azim suffered lost compensation and personally incurred substantial costs and expenses as a direct result of the UpHealth Parties' enrichment because Dr. Azim did not receive the compensation to which he was entitled as CEO, International and as a member of the Acquirer's Board.

207. Dr. Azim was also damaged as a direct result of the UpHealth Parties' enrichment because Dr. Azim lost compensation by stepping down from his position at Glocal in reliance on his promised appointment as CEO, International and appointment to the Acquirer's Board.

208. The UpHealth Parties had no justification for failing to appoint Dr. Azim as CEO, International and to the UHI Board because, on information and belief, the UpHealth Parties never intended to appoint Dr. Azim as CEO, International or to the Acquirer's Board—despite the UpHealth Parties' representations to the contrary.

209. Similarly, on information and belief, the UpHealth Parties had no justification for failing to appoint Dr. Azim to the promised positions, and the UpHealth Parties have not provided a justification for their failure to do so.

210. If the Court determines Clause 4.4.14 of the Amended SPA is an insufficient basis for breach of contract, there is by necessity no remedy to which Dr. Azim could recover for the UpHealth Parties' enrichment that directly harmed Dr. Azim. To remedy the unjust enrichment, Plaintiffs are also entitled to disgorgement of any benefit that the UpHealth Parties received.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court (1) enter an order consistent with the relief sought in the above-listed causes of action, including damages of at least $200 million; (2) disgorge any personal benefit that the UpHealth Parties, the UpHealth Directors, UHH, or UHI, obtained from breaches of fiduciary duty or unjust enrichment; (3) award Plaintiffs their reasonable and necessary attorneys' fees and costs to the fullest extent allowable by Delaware law (including for breaches of fiduciary duty, fraud, or bad faith), Indian law, and/or contract; and (4) grant Plaintiffs such other and further relief, at law or in equity, to which Plaintiffs are justly entitled.

Dated: September 23, 2024

Respectfully submitted,

*/s/ Robert F. Poppiti, Jr.*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Email: mlunn@ycst.com
rpoppiti@ycst.com

**PAUL HASTINGS LLP**
Paul R. Genender (admitted *pro hac vice*)
Jake Rutherford (admitted *pro hac vice*)
2001 Ross Avenue, Suite #700-168
Dallas, TX 75201
Telephone: (972) 936-7500
Email: paulgenender@paulhastings.com
jakerutherford@paulhastings.com

Conrad Coutinho (admitted *pro hac vice*)
Brian Kay (admitted *pro hac vice*)
600 Travis St., Floor 58
Houston, TX 77002
Telephone: (713) 860-7300
Email: conradcoutinho@paulhastings.com
briankay@paulhastings.com

Alex Cota (admitted *pro hac vice*)
Sam Lawand (admitted *pro hac vice*)
Xue Yu (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Email: alexcota@paulhastings.com
samlawand@paulhastings.com
xueyu@paulhastings.com

**COUNSEL FOR PLAINTIFFS**
***Glocal Healthcare Systems Private Limited,***
***Dr. Syed Sabahat Azim, Ms. Richa Sana Azim,***
***Mr. Gautam Chowdhury, and***
***Kimberlite Social Infra Private Limited***